UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Michael R. Lange and Sky Robotics, Inc., | |
| Plaintiffs, | Court File No. |
| vs. | |
| Mark A. Litman and Mark A. Litman & Associates, P.A., | |
| Defendants | |

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiffs, for their cause of action, state and allege as follows:

**JURISDICTION AND VENUE**

1.  This is a legal malpractice action, which may invoke the jurisdiction of this Court pursuant to 28 U.S.C. §1338, regarding a question of patent law.

2.  This Complaint is being pursued on an alternative basis, in the event that the state courts of Minnesota find jurisdiction to be exclusive in the federal courts.  Jurisdiction of the federal courts may be found at 28 U.S.C. §1338, as this case may involve a question of patent law.

3.  Venue is appropriate in this district, as all parties reside in this district, are citizens of the State of Minnesota, and that most of the significant actions complained of took place in the State of Minnesota.

## PARTIES

4.  Plaintiff, Michael R. Lange, is a resident of Ramsey County in the State of Minnesota.

5.  Plaintiff, Sky Robotics, Inc., is a Minnesota corporation owned by Plaintiff, Michael R.

    Lange.

6.  Defendant, Mark A. Litman, is a resident of Hennepin County in the State of Minnesota.

    Defendant is an attorney licensed to practice in the State of Minnesota and engaged in the

    practice of law at an office located in Edina, Minnesota.

7.  Defendant Mark A. Litman, to the best of Plaintiffs' knowledge and information, is

    owner of Mark A. Litman & Associates, P.A.

## FACTUAL BACKGROUND

8.  Plaintiff Michael R. Lange ("Plaintiff") is President and Chief Executive Officer of

    Plaintiff Sky Robotics, Inc. ("Sky Robotics"), a domestic corporation located in St. Paul,

    Minnesota.

9.  Plaintiff together with Dallas Simonette ("Simonette") invented and developed a means

    for cleaning walls or windows by means of high pressured de-ionized water, and a

    mechanical device ("the invention").

10. On March 19, 2003, Plaintiff signed a confidentiality agreement with GP Companies, Inc.

    ("GP") for the patent in progress for the invention, whereby GP agreed to perform the

    evaluation, marketing and distribution of the invention.

11. At that time, GP licensed the invention through Eagle Power Products Group Division, a

    division within the company.

2

12.     On July 25, 2003, Patrick Marsh ("Marsh"), as President of the Eagle Power Division of GP, wrote a letter to Plaintiff, whom Marsh referred to as a "partner of Eagle Power Products/GP Companies in the development of its automated window and wall washing products division."  In the letter, Marsh assured Plaintiff that GP/Eagle would "make every attempt to include [Plaintiff] in all activities and compensate him for his of [sic] efforts."

13.     On December 29, 2003, Plaintiff, as President of Sky Robotics, entered into a Patent License Agreement with GP by which Plaintiff licensed Sky Robotic's patents to GP.

14.     On November 5, 2004, Defendant filed Patent Application Number 10/982,505 ("Application '505"), before the United States Patent and Trademark Office ("USPTO") titled "Automated Cleaning System for Structures," on behalf of Plaintiff and Simonette for the invention.

15.     Application '505 included a Declaration signed by Plaintiff and Simonette appointing Defendant power of attorney to prosecute the application and transact all business with the USPTO in connection with Application '505.

16.     Upon information and belief,  Defendant has five or more years of experience as an Examiner for the United States PTO and more than 24 years of experience writing and prosecuting patent applications in the United States and abroad.  Defendant has also secured four patents as an inventor himself.

17.     For Application '505, Plaintiff requested that Defendant list Plaintiff as the first inventor, and Simonette as the second inventor.

3

18.     Contrary to Plaintiff's express wishes,  Defendant listed Simonette as the first inventor
        and Plaintiff as the second inventor on Application '505.

19.     In an email dated November 17, 2004 from Defendant's paralegal to Plaintiff, Simonette
        and Marsh, the paralegal stated that Defendant's office had received a postcard from the
        USPTO to confirm the filing of Application '505.

20.     In accordance with the licensing agreement of December 29, 2003, Application '505 was
        assigned by Plaintiff and Simonette to GP and Sky Robotics.  Defendant subsequently
        recorded the assignment in the USPTO.

21.     On November 11, 2005, IPC Eagle Corp. incorporated in Minnesota.  On information and
        belief, IPC Eagle, Corp. ("Eagle") consists entirely of the Eagle Power Products Group
        Division of GP.  On information and belief, Simonette was at that time, and is now
        currently, employed by Eagle.

22.     On numerous occasions, Plaintiff requested that Defendant file for international patent
        application for international patent rights in connection with Application '505.

23.     Defendant failed to advise Plaintiff of the deadline for filing for an international patent
        application for international patent rights in connection with Application '505, which was
        within 12 months after its filing date of November 5, 2004.  Instead, Defendant gave
        notices only to Simonette and GP who were not seriously interested in pursuing the patent
        at that time.

24.     Defendant failed to file for an international patent application on behalf of Plaintiff and
        Simonette in connection with Application '505.

4

25.   As a result of Defendant's failure to disclose to Plaintiff the deadline for filing an

international patent application for international patent rights, and Defendant's failure to

file for such rights on Plaintiff's behalf, Plaintiff is precluded from securing international

rights for the invention in Application '505.

26.   On an Information Disclosure Statement for Application '505 filed with the USPTO on

February 17, 2005, Defendant referred to himself as the representative for "Dallas

Simonette, et al," representing himself as counsel for Simonette and Plaintiff.

27.   Application '50 was published on May 11, 2006 with the number US2006/0096050 A1.

28.   On May 14, 2007, Defendant signed a response to the Office Action of March 23, 2007:

"Simonette, et al [...] By Their Representatives, Mark A. Litman & Associates, P.A.,"

again representing himself as counsel for Simonette and Plaintiff.

29.   In the meantime, Defendant began representing Dallas Simonette exclusively with respect

to a similar patent application, with respect to a fan or thruster to provide a force to press

the cleaner up against the wall of a building.  Later, it appeared to Plaintiff that Litman

was a good friend of Simonette, and participated with Simonette and his wife, both on a

business basis, as well as socially.

30.   On May 14, 2007, Defendant wrote a letter to Plaintiff stating that Defendant was

personally acquainted with Simonette and would therefore no longer represent Plaintiff.

31.   In the May 14, 2007 letter, Defendant requested that Plaintiff sign a "Waiver of Conflict

for Attorney/Firm," which stated that Plaintiff would "waive any and all conflicts for the

firm of Mark A. Litman & Associates, P.A. with respect to [the] conflict between Patent

Application subject matter work as between GP Companies and IPC Eagle with respect to any Patent Application work done by the Firm."  Plaintiff refused to sign the waiver.

32.     By requesting that Plaintiff sign the waiver of conflict, Defendant improperly sought to prospectively limit Defendant's own liability for conflicts of interests in Defendant's representation of Plaintiff.

33.     On May 22, 2007, in a letter from Defendant's legal assistant to Bill Brown, President and CEO of GP, Simonette and Plaintiff, Defendant's legal assistant enclosed a Petition for Extension of Time; a Response to Restriction Requirement; and an invoice for Defendant's legal services consisting of: "Review of Office Action, report out letter on Office Action, Discussions with [Plaintiff] and Mr. Simonette, filing amendment with the Patent & Trademark Office after written authorization from [Plaintiff]," totaling $925.00.

34.     By sending documents related to Application '505 and invoices for Defendant's legal services to Plaintiff, Defendant demonstrated the continuing nature of the parties' attorney-client relationship.

35.     On  June 11, 2007, at the behest of Plaintiff,  Attorney Paul A. Zimmer wrote Defendant a letter.  It should be kept in mind that Zimmer was not a patent attorney, and that only Litman had been representing Plaintiff with respect to his patent issues at that time.

36.     Plaintiff intended for Attorney Zimmer's letter to advise Defendant that Plaintiff did not wish to terminate Defendant and Plaintiff's attorney-client relationship despite Defendant's assertion that he was ending the representation.

37.     The letter of  June 11, 2007 advised Defendant of the conflict of interest created by Defendant's multiple representation of Plaintiff, Simonette, GP and Eagle, and that the interests of Plaintiff diverged from those of Simonette,  GP and Eagle.

38.     Attorney Zimmer further advised Defendant that Plaintiff would not waive the conflict of interest created by Defendant's multiple representation.

39.     Defendant failed to respond to Attorney Zimmer's letter of June 11, 2007.

40.     On July 27, 2007, the USPTO issued a Non-final Office Action regarding Application '505.  A response was due in the USPTO by October 27, 2007.

41.     On October 25, 2007, Defendant's legal assistant emailed to Simonette and Plaintiff a copy of the Office Action dated July 27, 2007 for Simonette and Plaintiff to review.

42.     By sending Plaintiff a copy of the Office Action dated July 27, 2007, Defendant indicated that Defendant continued to represent Plaintiff at that time.

43.      In an email dated October 26, 2007, Defendant wrote to Plaintiff: "I cannot develop an effective response to this Office Action [of July 27, 2007] without significant technical input.  Please plan to meet with me and/or provide a written description to enable a good response."

44.     At that same time, Defendant made various phone calls to Plaintiff, thereby continuing the parties' attorney-client relationship.

45.     On November 24, 2007, Plaintiff emailed Defendant to ask if Defendant had considered Plaintiff's idea to add a fan to the invention.

46.     On November 25, 2007, Defendant responded to Plaintiff's email of November 24, 2007 and wrote: "There is no disclosure of a 'fan' in [Application '505]."

7

47.    Against Plaintiff's express wishes, Defendant failed to file a second patent application which would have included Plaintiff's fan idea.

48.    In an email from Defendant to Plaintiff and Simonette dated November 27, 2007, Defendant requested payment of $3,190.00 from Plaintiff "in advance of continuing work on this project." Litman knew that this was contrary to the terms of the agreement between Plaintiff and GP. Nevertheless, Litman did not press GP for payment, but sought payment only from Plaintiff.

49.    In the email of November 27, 2007, Defendant also wrote: "[a]s there is no written engagement letter between me and Sky Robotics, but only GP, it is now necessary that the payments be made to me on a regular basis." Defendant was aware that GP was to pay the patent fees pursuant to its agreement with Plaintiff.

50.    By sending the email of November 27, 2007 seeking payment of legal fees by Plaintiff, Defendant demonstrated that the parties' attorney-client relationship continued to exist at that time.

51.    In an email from Defendant to Plaintiff dated December 11, 2007, Defendant stated that any further work for Application '505 was to be paid by the assignee, "which includes you," in reference to Plaintiff.

52.    In the email of December 11, 2007, Defendant also requested dissolution of his attorney-client relationship with Plaintiff and stated that he would cease being counsel of record once the outstanding bills were paid.

53.    By continuing to send Plaintiff invoices for Defendant's legal services up to and through mid-December 2007, Defendant treated Plaintiff as Defendant's client.

54.     By requesting dissolution of the parties' attorney-client relationship in the email of

December 11, 2007, Defendant illustrated the continuing nature of Defendant's legal

representation of Plaintiff.

55.     On December 12, 2007, Plaintiff signed a form revoking Defendant's power of attorney

and granting Richard O. Bartz and R. John Bartz power of attorney to prosecute

Application '505.

56.     On December 19, 2007, Plaintiff sent a letter to Defendant terminating Defendant's

services in connection with Application '505 and requesting that Defendant return "any

and all other files relating to Sky Robotics, Inc., and Michael R. Lange.

57.     On December 20, 2007, Defendant's legal assistant sent to Plaintiff what purported to be

the entire Application '505 patent prosecution file with an original copy thereof.

58.     The patent prosecution file was missing certain documents pertaining to the structure and

design of Sky Robotic's patents.

59.     In a letter dated January 2, 2008, Plaintiff informed Defendant that documents were

missing from Plaintiff's file.

60.     In an email dated January 3, 2008, Defendant told Plaintiff that Defendant had surrendered

to Plaintiff the Plaintiff's file in its entirety.

61.     In the email of January 3, 2008, Defendant wrote to Plaintiff: "[Y]ou are not taking

responsibility for payments at this time and have not recognized your responsibility for

requesting that the work should be done."

62.     In the email of January 3, 2008, by seeking payment of legal fees from Plaintiff, and by

indicating that Plaintiff had a "responsibility" to request that Defendant provide legal

9

services, Defendant again represented that the parties continued to maintain their attorney-client relationship.

63.    In the email of January 3, 2008, Defendant also wrote: "I cannot send you 'all correspondence with all parties' even as named, as I have separate business dealings with each of the parties outside the scope of the single Application at issue."

64.    By stating that he had "separate business dealings with each of the parties outside the scope" of Application '505, Defendant indicated that Defendant was engaged in impermissible, conflicting multiple representation of Plaintiff and other parties.

65.    In the January 3, 2008 email, Defendant also stated: "You have withdrawn my authority to act. I cannot act in this matter without reinstatement of authority [...] I have completely performed my legal and moral obligations on this application."

66.    By this statement, Defendant again indicated that Plaintiff was responsible for paying for Defendant's legal services and providing direction as to those services, demonstrating the ongoing attorney-client relationship between the parties.

67.    On December 19, 2007, Plaintiff lawfully terminated Plaintiff's legal representation by Defendant.

68.    Although Plaintiff ended the parties' attorney-client relationship on December 19, 2007, on January 8, 2008, Defendant faxed Plaintiff another set of invoices for "professional services rendered" by Defendant, totaling $5,400.00.

69.    On January 14, 2008, Defendant again corresponded with Plaintiff by sending Plaintiff an email to serve as a "final reminder" that Application '505 would be abandoned if a response was not filed in the USPTO by the end of January 2008.

70.    On July 13, 2007, Defendant filed a new patent application for "Stabilized Vertical Surface Cleaning," Application Number 12/218/347 ("Application '347") naming only Simonette as the inventor.

71.    Application '347 was published on February 19, 2009.

72.    In Application '347, Plaintiff Michael R. Lange was not identified as an inventor.

73.    Application '347, has some of the same drawings created and provided by Plaintiff for Application '505.

74.    Application '347, added a fan to the proposed design of the "Stabilized Vertical Surface Cleaning" invention.

75.    On April 28, 2009, Plaintiff wrote a letter to Defendant indicating that the fan idea was originally disclosed to Defendant by Plaintiff in 2004.

76.    Following the filing of Application '347, Defendant provided legal services to assist GP, and Eagle in securing international rights for the invention in Application '347.

77.    While Plaintiff was both a client and former client of Defendant's, Defendant simultaneously provided legal services, advice, counsel and patent analysis to GP, Eagle and Simonette.

78.    Defendant's representation of GP, and Eagle was in direct conflict with Defendant's representation of Plaintiff.

79.    Defendant's representation of Simonette was in direct conflict with Defendant's representation of Plaintiff.

80.   By providing legal advice and counsel to GP, Eagle, and Simonette to the detriment of his client and former client, Plaintiff, Defendant breached his confidentiality agreement with Plaintiff.

81.   By failing to remediate the conflict between Defendant's multiple representation of Plaintiff, Simonette and GP, and Eagle, Defendant breached the fiduciary duties of loyalty and care that Defendant owed to Plaintiff.

82.   To date, Plaintiff has received no recognition or compensation in connection with Patent Application '347.

83.   As a result of Defendants' negligence, Plaintiffs have been limited in their sales of the invention. Furthermore, Plaintiffs have been unable to protect their patent rights, and, in particular, international patents, from competitors.

84.   As  a result of Defendants' improper conduct and breach of fiduciary duties, Plaintiffs have suffered millions of dollars worth of economic harm entitling Plaintiffs to relief as set forth herein.

## COUNT ONE: NEGLIGENCE

85.   Plaintiffs realleges each and every paragraph herein.

86.   Defendants had a duty to provide proper and reasonable advice and counsel to Plaintiff.

87.   By their actions, Defendants failed uphold their duty owing to the Plaintiffs.

88.   Defendants' conduct was a deviation from the standard of care due and owing to Plaintiffs.

89.   Because of Defendants' negligence, Plaintiffs suffered significant economic damages as set forth herein.

## COUNT TWO: NEGLIGENCE - CONFLICT OF INTEREST

90.     Plaintiffs realleges each and every paragraph herein.

91.     Defendants had a duty to represent their client, Plaintiffs, with undivided loyalty.

92.     Defendants provided legal services to the benefit of Defendants' other clients, which was directly adverse to the interests of Plaintiffs.

93.     During the course of the representation, Plaintiffs never consented to, or waived, Defendants' conflict of interest.

94.     By their conduct, Defendants breached their duty to Plaintiffs to avoid conflicts of interest.

95.     As a result of Defendants' breach, Plaintiffs have incurred and will continue to incur substantial harm as set forth herein.

## COUNT THREE: BREACH OF FIDUCIARY DUTY

96.     Plaintiffs realleges each and every paragraph herein.

97.     Defendants' actions constitute a breach of the fiduciary duties of loyalty, care and confidentiality owed by Defendants to Plaintiffs.

98.     Defendants breached their duty of confidentiality to Plaintiffs by disclosing confidential information entrusted to Defendants by Plaintiffs.

99.     Defendants failed to act with reasonable care in providing legal services, advice and counsel to Plaintiffs.

100.    Defendants failed to uphold their duty of loyalty to Plaintiffs by representing other clients with interests directly adverse to the interests of Plaintiffs.

101.    As a result of Defendants' breach of the fiduciary duties Defendants owed to Plaintiffs, Plaintiffs suffered harm as set forth herein.

## COUNT FOUR: BREACH OF CONTRACT

102.   Plaintiffs realleges each and every paragraph herein.

103.   In their attorney-client relationship, Defendants and Plaintiffs entered into a contract by
which Defendants agreed to represent Plaintiffs in a competent, professional and ethical
manner; to uphold their fiduciary duties; and to disclose any and all material information
known by Defendants and bearing on Defendants' representation of Plaintiffs.

104.   Defendants breached Defendants' contract with Plaintiffs.

105.   As a result of Defendants' breach of contract, Plaintiffs suffered damages as set forth
herein.

### JURY DEMAND

PLAINTIFF DEMANDS A TRIAL BY JURY FOR ALL ITEMS SO TRIABLE.

WHEREFORE, based upon the foregoing, Plaintiffs seeks judgment against Defendants in
the amount of reasonable damages in excess of $75,000.00, with costs, interest and
disbursements, and such other and further relief as to the Court appears just and equitable.

Dated this 18th day of August, 2011          **SORTLAND LAW OFFICE**

                                               **s/ Paul A. Sortland**

                                               _____
                                               **Paul A. Sortland (#103573)**
                                               431 South Seventh Street, Suite 2440
                                               Minneapolis, Minnesota 55415
                                               (612) 375-0400

                                               **ATTORNEY FOR PLAINTIFF**

14